UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
TYREE HARGROVES, LAVAR HARGROVES,
BRANDON HARGROVES, and KENNETH
WRIGHT,

                Plaintiffs,

    - against -

THE CITY OF NEW YORK, NEW YORK CITY
POLICE DEPARTMENT, BARRY CULPEPPER,
and JOSEPH LIOTTA,

                Defendants.
-----------------------------------------------------------X

-----------------------------------------------------------X
DAVID ALLEN,

                Plaintiffs,

    - against -

THE CITY OF NEW YORK, NEW YORK CITY
POLICE DEPARTMENT, BARRY CULPEPPER,
JOSEPH LIOTTA, and JOHN WARNER,

                Defendants.
-----------------------------------------------------------X

**MEMORANDUM & ORDER**
03-CV-1668 (RRM)(ALC)
03-CV-3869 (RRM)(ALC)
03-CV-5323 (RRM)(ALC)

03-CV-4646 (RRM)(ALC)

**MAUSKOPF, United States District Judge.**

    Plaintiffs Tyree Hargroves, Lavar Hargroves, Brandon Hargroves, and Kenneth Wright

(collectively, the "Hargroves Plaintiffs"), as well as David Allen (together with the Hargroves

Plaintiffs, "Plaintiffs"), bring these actions,[1] now consolidated, alleging that on the night of

---

[1] All four of these actions have been consolidated for the purposes of the related summary judgment motions pending in each under the lead case *Tyree Hargroves v. City of New York*, No. 03-cv-1668, and the three subsidiary

March 20, 1998, around midnight, Plaintiffs were unlawfully arrested by Police Officers Barry

Culpepper, Joseph Liotta, and John Warner. Plaintiffs' claims, brought pursuant to 42 U.S.C.

§ 1983, are for illegal stop and detention, false arrest, malicious prosecution, and violation of

plaintiffs' equal protection rights because of alleged racial profiling. Plaintiffs also bring various

state law claims based on similar allegations. Plaintiff Allen additionally alleges conspiracy

under 42 U.S.C. § 1985 and excessive force claims. Defendants the City of New York (the

"City"), the New York City Police Department (the "NYPD"), and Police Officers Barry

Culpepper, Joseph Liotta, and John Warner move for summary judgment primarily on the issue

of qualified immunity, but also argue (1) that Plaintiffs' false arrest, illegal stop and detention,

racial profiling, and conspiracy claims are time-barred; (2) that Plaintiffs' malicious prosecution

claims fail on the merits; (3) that there is no basis for Plaintiffs' § 1983 claim to proceed against

the City; (4) that there is no actionable claim against Defendant Warner; and (5) that the

Hargroves Plaintiffs' state law claims against the City must be dismissed for failure to comply

with the notice requirements of New York General Municipal Law § 50-e. Plaintiffs cross-move

for summary judgment on Defendants' affirmative defense of qualified immunity, arguing that

cases were administratively closed during the pendency of the motions. Given the disposition of the motions, the
Clerk of Court is ordered to reopen each case.

the defense should be stricken, and that they are therefore entitled to summary judgment on the malicious prosecution claims against the Individual Defendants. For the reasons set forth below, the Court grants Defendants' motion for summary judgment as to Defendant Warner and as to Plaintiff Allen's § 1983 claims for excessive force, and all of his § 1985 claims, but denies their motion with respect to all other claims. The Court denies Plaintiffs' motion for summary judgment in its entirety.

## BACKGROUND[2]

*A.       The Events of March 20–21, 1998*

On March 20, 1998, at approximately 11:30 p.m., Zhi Wu, a Chinese food delivery man, was attacked and robbed by a group of black men near 100-41 196th Street in Queens, New York. The men in the group hit, punched, and kicked Wu, stealing cash and food from him. After attacking Wu, the attackers fled toward Jamaica Avenue. Wu did not recognize his attackers, but later told police officers that he had seen their faces and clothing during the attack. At some time after 11:50 p.m., Defendants Culpepper and Liotta heard a radio call regarding a robbery, and drove to 100-41 196th Street, where they spoke with Wu. As relevant here, Wu told Culpepper that he had been attacked by a large group of male black youths, and that one of the

---

[2] The following facts are taken from the Local Rule 56.1 statements submitted by the parties and the affidavits and exhibits submitted in connection with the motions. The facts are uncontroverted, except as noted.

men who had attacked him was wearing a very big overcoat or "fluffy" jacket that was orange in color. Wu also told Culpepper that he would be able to identify the attackers.

Culpepper and Liotta then canvassed the neighbourhood surrounding the crime scene in their vehicle, during which time Culpepper heard a radio broadcast describing Wu's attackers as being armed with a firearm, and one of them wearing an orange jacket. Liotta claimed that he received a radio broadcast describing a male black suspect with an orange and black jacket. After approximately ten minutes of canvassing the area, Culpepper noticed a group of black males walking down Jamaica Avenue near 198th Street toward the site of the attack, reportedly the only group that Culpepper saw during the canvass. Jamaica Avenue at 198th Street is less than eight blocks from where the attack occurred. At approximately 12:10 a.m., Culpepper and Liotta pulled over in front of the group of men, stopped the group, and called for backup. Notably, the group of men did not attempt to flee when the police stopped them.

It is here that the accounts of Defendants and Plaintiffs diverge significantly. Culpepper claimed that he stopped the group of black males because "they were close to the scene of the crime, the time of night, the fact that the males were the only persons that Culpepper observed during the canvass, the fact that one of the males wore a jacket matching the description provided to him by Wu and what he heard over the radio run, the age of the males and the fact that they were black." (Defs.' L.R. 56.1 Stmt. (Doc. No. 103) ¶ 35.) Culpepper also claims that he saw that one of the persons in the group, whom he later identified as Lavar Hargroves, was

4

wearing what he described as "like an orange jacket" or "a jacket with some orange on it" or a "red orange jacket." (*Id.* ¶ 34.) Liotta claimed that he observed one of the individuals wearing a black and orange jacket. (*Id.* ¶ 36.) Plaintiffs, on the other hand, argue that the evidence establishes that no member of their group was wearing anything that could be termed an orange jacket, whether orange or black and orange. They claim that the only possible reason Culpepper and Liotta had for stopping them was because they were male and black. Moreover, Plaintiffs maintain that, prior to a show-up, described below, Defendants expressed the belief to Chikosi Kidd, another member of the group who was not arrested, that Plaintiffs were guilty of attacking Wu.[3] (Pls.' L.R. 56.1 Resp. Stmt. (Doc. No. 113) ¶ 47.)[4]

Following the stop, Culpepper arranged to have Wu brought to 198th Street and Jamaica Avenue so that Culpepper could conduct a show-up identification. Wu arrived within forty-five minutes of the attack, and he attempted to identify whether any of the group had been his

---

[3] Because Plaintiffs aver this to be the case in their responsive statement of facts, rather than in their counter-statement, Defendants did not have the opportunity to rebut it. Presumably, however, Defendants would argue that they did not make statements regarding Plaintiffs' guilt prior to the show-up, creating a dispute of fact. If, on the other hand, Defendants admitted these statements, it would raise serious doubts as to the reliability of the show-up procedures.

[4] Plaintiffs' Local Rule 56.1 Responsive Statement was prepared by counsel for the Hargroves Plaintiffs. Counsel for David Allen has joined in the Hargroves Plaintiffs' Rule 56.1 Statement. (Doc. No. 111 at 1.) In addition, counsel for David Allen has adopted the Hargroves Plaintiffs' arguments. (Allen Opp'n (Doc. No. 111) at 3; Allen Letter to Court (Doc. No. 137).)

attackers. Wu viewed each individual from the rear passenger seat of the police car, while Culpepper stood next to him outside the car. The parties disagree as to whether each member of the group was presented to Wu or whether only the seven individuals eventually identified as attackers were presented. The parties agree that the area was lit by streetlights, police car headlights, and police car spotlights, but disagree as to the quality of the lighting or the visibility. The parties also disagree as to Wu's ability to see, with the Plaintiffs arguing that Wu had been badly beaten during the attack, that his face was "puffed up really bad," and that his eyeglasses, which he needed to see beyond one foot, had been "punched in." (Pls.' L.R. 56.1 Resp. Stmt. ¶ 47.) Furthermore, Plaintiffs argue that Wu could not communicate well in English, and so cast doubt on his understanding of what was going on, and his communications with Culpepper during the show-up. (*Id.*) Defendants dispute that Wu's vision was impaired, or that he had any difficulty in communicating with Culpepper. Finally, it is undisputed that Wu had in fact been shot in the leg during the earlier attack, but apparently did not realize his injury until after the show-up, at the police station.[5]

---

[5] Plaintiffs suggest that this indicates that Wu was in a state of shock following the attack and throughout the show-up. (Pls.' Opp'n (Doc. No. 112) at 46–47.)

The parties agree that Wu eventually identified seven members of the group as having been among the group that attacked him: the four Hargroves Plaintiffs, Allen, Lawrence Strickland, and Delroy Ridley. Two other members of the group, Chikosi Kidd and Quame Riley, were released following the show-up procedure. The seven members of the group identified as having participated in the attack were arrested and eventually taken to Central Booking. It is undisputed that the only role Defendant Warner played in the events of March 20–21 was in taking the statements of Brandon and Tyree Hargroves and possibly taking photographs of some of the Plaintiffs at the precinct house after they were arrested.

B.    *Lavar Hargroves' Jacket*

The key factual dispute between the parties turns on the appearance of Lavar Hargroves' jacket. As noted above, complainant Wu told Culpepper that one of the attackers wore an orange jacket, and Culpepper noted that his observation of Lavar Hargroves wearing what he described as "like an orange jacket" or "a jacket with some orange on it" or a "red orange jacket" was one of the reasons that he stopped the group of individuals on Jamaica Avenue and 198th Street. (Defs.' L.R. 56.1 Stmt. ¶ 34.) Plaintiffs, however, deny that Lavar Hargroves, or any other member of the group, was wearing an orange jacket. Unfortunately, the record on this point is unclear; two separate pictures taken the night of the arrest depict a jacket that is blue and red, with what appears to be a reflective, lighter red inner lining. Notably the appearance of the lining differs from one picture to the next; in a Polaroid taken the night of the arrest (Pls.' Ex.

7

41)[6], the lining appears almost beige, and in the photograph taken at Central Booking (Pls.' Ex. 40), it appears as described above. Defendants concede that the photograph taken at Central Booking showed the jacket that Lavar Hargroves was wearing on the night of the arrest, but Defendant Culpepper testified that the jacket in the photograph was orange. (Defs.' L.R. 56.1 Stmt. ¶ 72.) Defendant Culpepper testified that the Polaroid photo did not show Lavar Hargroves wearing the orange jacket that he observed. (*Id.* ¶ 73.) Defendant Culpepper also testified that he believed that Lavar Hargroves could have been wearing the orange jacket beneath the blue and red jacket depicted in the photographs. (*Id.* ¶ 74.)

C.    *Procedural History*

Plaintiffs and two others were indicted on two counts of robbery in the first degree, robbery in the second degree, assault in the first degree, gang assault in the first degree, gang assault in the second degree, and criminal possession of a weapon in the second degree on March 27, 1998. Plaintiffs' motion to suppress their identification by Wu was denied by New York Supreme Court Justice Seymour Rotker following an evidentiary hearing. On May 23, 2000, Plaintiffs were convicted after trial of certain counts of the indictment and remanded to custody. On July 29, 2002, the Appellate Division, Second Department, reversed the conviction of

---

[6] "Pls. Ex." refers to exhibits to the Declaration of Steven M. Weiner (Doc. No. 121).

8

Brandon Hargroves, finding a lack of reasonable suspicion to stop and detain him by Defendants

Culpepper and Liotta. Specifically, the Second Department found that:

> Even if the jacket worn by one member of the group that included the defendant
> can be considered orange rather than red and blue, this general description was
> not sufficient to permit the police to detain and then exhibit the defendant, among
> others, to the complainant. We further note that the group was walking towards
> the crime scene and did not flee when stopped by the police. Thus, the police
> lacked reasonable suspicion to stop and detain the defendant and the hearing court
> should have granted that branch of the omnibus motion which was to suppress the
> identification testimony.

*People v. Brandon Hargroves*, 296 A.D.2d 581, 582 (N.Y. App. Div. 2002). For the same

reasons, the Second Department went on to reverse the convictions of the other Plaintiffs.

*People v. Lavar Hargroves*, 296 A.D.2d 582 (N.Y. App. Div. 2002); *People v. Wright*, 296 A.D.2d

585 (N.Y. App. Div. 2002); *People v. Tyree Hargroves*, 303 A.D.2d 766 (N.Y. App. Div. 2003);

*People v. David Allen*, 303 A.D.2d 686 (N.Y. App. Div. 2003). The Plaintiffs were released from

custody in 2002 and 2003.[7]

---

[7] Lavar Hargroves was released from custody on June 26, 2002. Brandon Hargroves was released from custody on
July 25, 2003. Kenneth Wright was released from custody on August 6, 2002. David Allen was released from
custody on December 5, 2002. Tyree Hargroves was released from custody on January 3, 2003.

# LEGAL STANDARD

## I.    Summary Judgment Standard

Summary judgment is appropriate when the pleadings, depositions, interrogatories, admissions, and affidavits demonstrate that there are no genuine issues of material fact in dispute and that one party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether a genuine issue of material fact exists, the evidence of the non-movant "is to be believed" and the court must draw all "justifiable" or "reasonable" inferences in favor of the non-moving party. *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)); *Brosseau v. Haugen*, 543 U.S. 194, 195 n.1 (2004). Nevertheless, once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law, "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*,'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in original), and "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (citing cases). In other words, the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256. Where "the nonmoving party bears the burden of proof at trial, summary judgment is

10

warranted if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to [its] case." *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993) (quoting *Celotex*, 477 U.S. at 322) (internal quotation marks omitted) (alteration in original). Thus, "[a] defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case." *Allen v. Cuomo*, 100 F.3d 253, 258 (2d Cir. 1996) (citing *Anderson*, 477 U.S. at 247-48).

## DISCUSSION

I.    **Section 1983 Claims for False Arrest and False Imprisonment**

42 U.S.C. § 1983 provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured.

A § 1983 claim requires the plaintiff to "allege that (1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." *Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999). To plead a false arrest, the "plaintiff must show: (1) that defendants intended to confine her; (2) that she was conscious of her confinement; (3) that she did not consent to be confined; and (4) that the confinement was not otherwise privileged." *Brewton v. City of New York*, 550 F. Supp. 2d 355, 363 (E.D.N.Y. 2008) (citations

11

omitted). Probable cause "'is a complete defense to an action for false arrest.'" *Id.* (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)). "Even absent probable cause to arrest, a police officer will be entitled to qualified immunity if he can demonstrate that there was arguable probable cause for the arrest." *Brewton*, 550 F. Supp. 2d. at 363. Because false arrest "is a species of false imprisonment," this court will treat these claims as one and the same in its analysis. *Singer v. Fulton County Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995).

A.    *Probable cause*

There is probable cause if "the arresting officer [has] knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) (internal quotations omitted). In addition, "it is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness." *Id.* (internal quotations omitted). "When determining whether probable cause exists courts must consider those facts available to the officer at the time of the arrest and immediately before it, as probable cause does not require absolute certainty." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (internal quotations and citations omitted). Moreover, "[a]n arresting officer advised of a crime by a person who claims to be the victim, and who has signed a complaint or information charging someone with

the crime, has probable cause to effect an arrest absent circumstances that raise doubts as to the victim's veracity." *Singer*, 63 F.3d at 119.

Plaintiffs argue that Defendants lacked probable cause to stop or arrest them. Officer Culpepper himself admitted that Wu provided him with a "vague description" of the suspects. (Defs.' L.R. 56.1 Resp. Stmt. (Doc. No. 133) ¶ 42). While the parties do not agree on what Wu actually told the police, at the very least there was the mention that one or more of his attackers, who numbered at least ten, was wearing a "fluffy jacket" or "a very big overcoat" that was some shade of orange. (*Compare* Defs.' L.R. 56.1 Stmt. ¶ 21, *with* Pls.' L.R. 56.1 Resp. Stmt. ¶ 21.) After stopping a group of black males on Jamaica Avenue, which included Plaintiffs, Officer Culpepper claimed that he saw Lavar Hargroves wearing "like an orange jacket" or "a jacket with some orange on it" or a "red orange jacket." (Defs.' L.R. 56.1 Stmt. ¶ 34.) In the documents filed before this Court, however, the parties do not dispute that Lavar Hargroves was actually wearing a red and blue jacket with a removable red liner. While the defendants admit that Lavar Hargroves was wearing a red and blue jacket, they also state in their Rule 56.1 Statement that Culpepper "was certain that at the time of his arrest, Lavar was wearing an orange colored jacket." (*Id.* ¶¶ 74–75.)

Plaintiffs point to Culpepper's 1999 testimony, where he stated that the only reason he stopped them was because one of them was wearing an orange coat and they were the only group of black males he encountered during the search following the robbery. (Defs.' L.R. 56.1 Stmt. ¶

13

35.) Because the coat turned out to be a different color, Plaintiffs argue that the only reason they were stopped was because of their race and gender. Plaintiffs further allege that the NYPD had a policy of racial profiling in violation of their constitutional rights.[8]

Plaintiffs also argue that the show-up procedure, during which the police presented the suspects to Wu, was improper, and that Wu was an unreliable witness. The show-up occurred within forty-five minutes of the attack, during which Wu was shot in the leg, although he did not realize he had been injured until hours later. (Defs.' L.R. 56.1 Stmt. ¶¶ 26, 40; Pls.' L.R. 56.1 Counter-Stmt. ¶ 31.) According to the plaintiffs, Wu was "badly beaten", his face "was puffed up really bad", and his eyeglasses, without which he cannot see clearly beyond one foot, were "punched in." (Pls.' L.R. 56.1 Stmt. ¶ 47.) While Defendants aver that Wu could see clearly enough to make confident identifications, there is at least some genuine dispute about this fact. Furthermore, Wu and Culpepper spoke in English, even though there is a dispute as to Wu's mastery of the English language, and it is clear that Wu had a Mandarin interpreter in the civil and criminal proceedings related to this incident. (*Id.* ¶ 47, Pls.' L.R. 56.1 Counter-Stmt. ¶ 38.)

---

[8] Plaintiffs also point to the fact that they were walking towards the crime scene when they were stopped by police as evidence that they were stopped because of their race and gender and not based on any reasonable suspicion by Defendants. (Pls.' L.R. 56.1 Counter-Stmt. (Doc. No. 113) ¶ 52.) Defendants have not adequately contested this statement of fact, (Defs.' L.R. 56.1 Resp. Stmt. ¶ 52), which is also supported by the ruling of the Appellate Division. *People v. Brandon Hargroves*, 296 A.D.2d 581, 582 (N.Y. App. Div. 2002).

Because there is a dispute over material facts, it would be inappropriate for this court to grant Defendants summary judgment over the false-arrest cause of action based on their claim that there was probable cause to detain and arrest the Plaintiffs. While Culpepper testified that he saw Lavar Hargroves wearing an orange coat, the discrepancies in his testimony and the lack of any evidence to support his recollection create at least a dispute over this very material fact, and also raise credibility issues that are better decided by the jury. In addition, the decision of the Second Department establishes that even if Lavar Hargroves' jacket was, in fact, orange, and not blue and red, Defendants still lacked reasonable suspicion to detain Plaintiffs or to present them to Wu for identification.

Finally, there are numerous additional disputes with respect to the show-up procedure that must be resolved to determine if the Defendants violated Plaintiffs' rights. Among them are disputes over the damage to Wu's glasses and how far away Wu was from the Plaintiffs during the procedure. Moreover, Plaintiffs have stated that the officers said they believed they were guilty. And, if Lavar Hargroves was not wearing an orange jacket, a factfinder could conclude that the sole reason for Defendants to stop Plaintiffs was racial profiling or racial animus. Plaintiffs have also made claims that Wu was unreliable during the show-up procedure. Hence, there are disputes over material facts as to both the stop and the eventual arrest and imprisonment of Plaintiffs.

*B.    Qualified immunity*

Under the qualified-immunity doctrine, Defendants can avoid liability even if there are material questions of fact as to probable cause. *Brewton*, 550 F. Supp. 2d at 367. "Qualified immunity shields a police officer from liability for damages if he can demonstrate that there was arguable probable cause for the arrest." *Id.* (internal quotations and citation omitted). "Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Id.* (internal quotations and citation omitted). The Second Circuit has ruled that:

> Disputes over reasonableness are usually fact questions for juries. However, in qualified immunity cases, we are not concerned with the correctness of the defendants' conduct, but rather the "objective reasonableness" of their chosen course of action given the circumstances confronting them at the scene. With this concern in mind, we have held that when the factual record is not in serious dispute . . . the ultimate legal determination whether . . . a reasonable police officer should have known he acted unlawfully is a question of law better left for the court to decide.

*Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir. 1995) (citations omitted).

The Court notes that our predecessor Court, Judge Irizarry, twice considered the issue of qualified immunity on a Rule 12(c) motion for judgment on the pleadings, and declined to dismiss the Plaintiffs' claims. (*See* Order Denying Defs.' Mot. To Dismiss (Doc. No. 37), Order Denying Mot. for Reconsideration (Doc. No. 47).) Following these decisions, discovery proceeded solely with respect to the question of qualified immunity. (*See id.* at 12.) However,

even following that limited discovery, there remain genuine issues of material fact that preclude a grant of summary judgment. The same factors that counsel against awarding summary judgment based on probable cause also apply to an assessment of arguable probable cause for purposes of deciding qualified immunity. If indeed Lavar Hargroves was not wearing an orange jacket, as the evidence suggests, and if Wu was not in the position to reliably identify his attackers, as the Plaintiffs claim and the Defendants deny, then it was not objectively reasonable for Culpepper to believe that there was probable cause to stop or arrest the Plaintiffs.

Defendants cite a litany of cases where courts have found probable cause to arrest following show-up procedures, (see Defs.' Mem. at 10–12), but all of them dealt with show-up procedures challenged as unduly suggestive, and not, as here, a witness regarding whose reliability the plaintiffs have successfully created a genuine issue of material fact. Because Plaintiffs have provided sufficient evidence to create genuine disputes of material fact as to the physical state of Wu during the procedure and the reliability of his identifications, the cases cited by Defendants are distinguishable.

Defendants also cite *Townes v. City of New York*, 176 F.3d 138, 148 (2d Cir. 1999), for the proposition that there is no "fruit of the poisonous tree" concept for § 1983 claims. The *Townes* Court ruled that "[v]ictims of unreasonable searches or seizures may recover damages directly related to the invasion of their privacy—including (where appropriate) damages for physical injury, property damage, injury to reputation, etc.; but such victims cannot be compensated for

17

injuries that result from the discovery of incriminating evidence and consequent criminal prosecution." *Id.* The argument here, however, is over whether Wu's identification was incriminating evidence to begin with. Plaintiffs essentially claim that Wu was not in a position to identify his attackers, and hence the police had no probable cause to arrest them. They also allege that they should not have been stopped in the first place because Lavar Hargroves' jacket was not orange. Thus, the *Townes* decision does not support the defense of qualified immunity in this case.

     *C.*     *Statute of limitations*

     Defendants argue that *Wallace v. Kato*, 549 U.S. 384 (2007), renders Plaintiffs' false arrest, illegal stop and detention, and racial profiling claims, as well as Plaintiff Allen's claims arising under §§ 1981, 1983, and 1985, barred by the statute of limitations. In *Wallace*, the Court held "that the statute of limitations upon a § 1983 claim seeking damages for a false arrest in violation of the Fourth Amendment, where the arrest is followed by criminal proceedings, begins to run at the time the claimant becomes detained pursuant to legal process." *Id.* at 397. In other words, "a false imprisonment ends once the victim becomes held *pursuant to such process*— when, for example, he is bound over by a magistrate or arraigned on charges," and thus, "the

statute would have begun to run from that date." *Id.* at 389.[9] The Court went on to hold that, under this interpretation of the accrual date, the claims of the plaintiff in *Wallace* were time-barred. *Id.* at 397.

Section 1983 actions brought in New York have a three-year statute of limitations. *Loyal Tire & Auto Center, Inc. v. Town of Woodbury*, 445 F.3d 136, 151 (2d Cir. 2006). The plaintiffs were arraigned and indicted in late March 1998. (*See* Defs.' L.R. 56.1 Stmt ¶¶ 82–83.) Plaintiffs Tyree Hargroves, Lavar Hargroves and Kenneth Wright commenced their lawsuit on April 4, 2003, while Brandon Hargroves commenced his on August 7, 2003. (Pls.' L.R. 56.1 Resp. Stmt. ¶¶ 1–2.) David Allen filed his claims on September 10, 2003. (Allen Compl. (No. 03-cv-4646, Doc. N o. 1).) Under *Wallace*, Plaintiffs' limitations period expired in March 2001. Accordingly, the claims for false arrest and false imprisonment were filed more than two years after the limitations period expired.

Plaintiffs argue that the limitations period should be tolled because the *Wallace* decision overturned the prior law in the Second Circuit, which at the time their complaints were filed suggested that accrual occurs at a different time than arrest or arraignment. Specifically, in

---

[9] The *Wallace* court used "false imprisonment" to refer to both false arrest and false imprisonment. 549 U.S. at 388–89.

*Roesch v. Otarola*, 980 F.2d 850 (2nd Cir. 1992), the circuit court held that, "[a] person who thinks there is not even probable cause to believe he committed the crime with which he is charged must pursue the criminal case to an acquittal or an unqualified dismissal, or else waive his section 1983 claim." *Id.* at 853. Seven years later, the court appeared to reiterate *Roesch* when it said that "[s]o long as the criminal case remained pending . . . a parallel § 1983 case based upon a false arrest . . . would create the distinct possibility of an inconsistent result if the prosecutor's evidence was dependent upon a valid arrest." *Covington v. City of New York*, 171 F.3d 117, 124 (2d Cir. 1999) (applying the rule of *Heck v. Humphrey*, 512 U.S. 477, 486 (1994), holding that a § 1983 action for damages attributable to an unconstitutional conviction or sentence does not accrue until the conviction or sentence has been invalidated), *overruled by Wallace*, 549 U.S. 384 (2007).

"[S]tate tolling rules, like state limitations periods, govern federal actions brought under § 1983 except when inconsistent with the federal policy underlying § 1983." *Singleton v. New York*, 632 F.2d 185, 191 (2d Cir. 1980) (citing *Bd. of Regents v. Tomanio*, 446 U.S. 478 (1980)). As "New York law does not provide for tolling during periods of imprisonment or 'when a criminal prosecution is pending against the plaintiff,'" *Coleman v. City of New* York, No. 08-cv-5276 (JG)(LB), 2009 U.S. Dist. LEXIS 97692 (E.D.N.Y. Oct. 20, 2009) (quoting *Singleton*, 632 F.2d at 191), Plaintiffs must demonstrate that equitable tolling applies to their claims. Equitable tolling is available only in "'rare and exceptional circumstances,' where [the court finds] that

'extraordinary circumstances' prevented a party from timely performing a required act, and that the party 'acted with reasonable diligence throughout the period he [sought] to toll.'" *Walker v. Jastremski*, 430 F.3d 560, 564 (2d Cir. 2005) (quoting *Doe v. Menefee*, 391 F.3d 147, 159 (2d Cir. 2004)) (alteration in original); *see also Wallace*, 549 U.S. at 396 ("Equitable tolling is a rare remedy to be applied in unusual circumstances.").

This Court's research has found no case in which the Second Circuit addressed the issue of whether an intervening change in the law, such as occurred following the *Wallace* decision, can constitute such rare and extraordinary circumstances in the context of § 1983, nor have the parties identified such a decision. *Cf. infra* n.11. Nonetheless, and for the reasons that follow, the Court now decides that, at least under the circumstances of this case, the change in law occasioned by *Wallace* is the type of extraordinary circumstance that justifies equitable tolling.[10]

As noted above, Plaintiffs filed their complaints between April and September of 2003, at which time the law in this circuit was stated by *Covington*, which, applying *Heck*, barred pursuit

---

[10] While Plaintiffs also make the argument that *Wallace* should not be applied to their claims because the underlying events occurred prior to the issuance of the *Wallace* decision, it is clear that *Wallace* does apply retroactively. *See, e.g., Wallace*, 549 U.S. at 397 (applying holding to parties in that case); *Mallard v. Potenza*, No. 94-CV-223(CBA), 2007 U.S. Dist. LEXIS 86336, at *10–11 (E.D.N.Y. Nov. 21, 2007) (holding that *Wallace* should be applied retroactively); *see also Reynoldsville Casket Co. v. Hyde*, 514 U.S. 749, 752 (1995) (when the Supreme Court decides a case and applies a new legal rule to the parties before it, then the rule must be treated as retroactive, applying to all pending cases, whether or not those cases involve predecision events); *Mallard*, 2007 U.S. Dist. LEXIS 86336, at *11 (collecting cases in which *Wallace* was applied retroactively).

of a § 1983 claim of false arrest during the pendency of a criminal proceeding arising from the same transaction if the parallel § 1983 case "would create the distinct possibility of an inconsistent result if the prosecutor's evidence was dependent upon a valid arrest." 171 F.3d at 124. Defendants do not argue that Plaintiffs' claims of false arrest and false imprisonment would not have been covered by this rule, and this Court finds that they would have been. *See also Hargroves*, 296 A.D.2d at 582 (reversing Brandon Hargroves' conviction on the basis of unconstitutional stop). Clearly, then, if Plaintiffs had brought their claims within three years of their March 1998 arrest, during which time they were still appealing their convictions, those claims would have been dismissed under *Covington* because they would not yet have accrued. Conversely, Defendants argue that Plaintiffs' claims, which were timely when brought, are now untimely under the holding of *Wallace*. Plaintiffs were diligent in pursuing their claims (each filing suit within a year after their convictions were overturned), and could not have predicted the still-years-away change in the law. This constitutes precisely the sort of extraordinary

circumstances in which equitable tolling should operate to save Plaintiffs' claims.[11]

Plaintiffs have identified a decision from the Eastern District of Michigan where, under

similar circumstances, the Court found that plaintiffs were entitled to equitable tolling of their

Fourth Amendment claims:

> There can be no question that the plaintiffs relied on Sixth Circuit precedent to
> their prejudice in this case. The untimeliness of the plaintiffs' complaint results
> from an understandable confusion about the state of the law as to when their claim
> accrued. That confusion was created by the courts themselves. The delay did not
> result from the plaintiffs' failure to diligently pursue the claim. In fact, the

---

[11] This Court is not aware of cases in which equitable tolling has been applied specifically to save false imprisonment claims from the effects of *Wallace*. However, courts have applied equitable tolling following an intervening change of law in the context of the one-year statute of limitations contained in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified at 28U.S.C. § 2244(d). For example, in *Felton v. Mazzuca*, No. 98-CIV-4567 (KMW)(RLE), 2004 U.S. Dist. LEXIS 11472 (S.D.N.Y. Sept. 9, 2004), the Court reversed its earlier decision dismissing Felton's *habeas corpus* petition as time-barred. The petition was first filed on June 29, 1998, but was dismissed without prejudice to allow Felton to exhaust various claims on October 27, 1998. *Id.* at *7 & n. 6–7. Felton refiled his petition on May 25, 2001, after which it was dismissed on May 23, 2002 on the grounds that he had failed to comply with the one-year statute of limitations of AEDPA. *Id.* at *1–2. Following remand from the Court of Appeals, in which, *inter alia*, the District Court was instructed to consider whether statutory or equitable tolling should be applied to render the petition timely, the Court found that equitable tolling was appropriate during the entire time that the original petition was pending, thereby making the refiled petition timely. *Id.* at *2, 9–17. Specifically, the Court found that extraordinary circumstances existed because the Supreme Court's decision in *Duncan v. Walker*, 533 U.S. 167 (2001), which held that the AEDPA limitations period was not tolled during the pendency of another federal *habeas* petition, and which rendered Felton's second petition untimely, could not have been anticipated. *Id.* at *13–14; *see Owens v. Murphy*, No. 01cv1480 (SRU), 2003 U.S. Dist. LEXIS 16605, at *13–18 (D. Conn. Sept. 4, 2003) (period when first petition pending should be equitably tolled because *Duncan* had been unanticipated and petitioner had been diligent); *De Jesus v. Miller*, 215 F. Supp. 2d 410 (S.D.N.Y. 2002) (same); *Jimenez v. Walker*, 166 F. Supp. 2d 765, 772 (E.D.N.Y. 2001) (same); *see also Harris v. Carter*, 515 F.3d 1051, 1054—57 (9th Cir. 2008) (equitably tolling AEDPA limitations period because of intervening change in controlling law that would render petition untimely where petitioner had relied on then-controlling precedent in waiting to file his petition); *York v. Galetka*, 314 F. 3d 522, 527–28(10th Cir. 2003) (same).

> plaintiffs filed their complaint less than one year after their convictions were reversed.
>
> Moreover, strict application of *Wallace* to this case effectively deprives the plaintiffs of their cause of action. If the plaintiffs had filed their case immediately after the search on May 4, 2001, Sixth Circuit precedent would have required dismissal of the case as barred by *Heck*. Once the law changed, the plaintiffs' convictions having been reversed on September 30, 2004, the plaintiffs would be barred by the statute of limitations under *Wallace*. This is "a result surely not intended." *Wallace*, 127 S. Ct. at 1099 n.4. Rather, this is the unusual case that fits neatly within the doctrine of equitable tolling.

*Kucharski v. Leveille*, 526 F. Supp. 2d 768 (E.D. Mich. 2007). This Court's research has also

identified at least one other case using similar logic to toll the statute of limitations on a false

imprisonment claim. *See Kennedy v. City of Villa Hills*, Civ. A. No. 07-122-DLB, 2008 U.S.

Dist. LEXIS 17301, at *19–24 (E.D. Ky. Mar. 6, 2008). Furthermore, the Supreme Court itself

considered the potential for inequities to arise out of *Wallace*, stating that it would be a "result

surely not intended" to find that a plaintiff originally prevented from filing suit by *Heck*, on

account of a still pending conviction, was barred by the statute of limitations from filing suit

after obtaining reversal of his conviction because of the change in law announced in *Wallace*.

549 U.S. at 395 n.4 (leaving undecided the specifics of how much time after reversal should be

allowed a plaintiff to file suit because that situation was not presented in *Wallace*).

None of the decisions in this district applying *Wallace* to bar § 1983 claims confronted

the same case for equitable tolling as now before this Court, and so are distinguishable. In

*Jefferson v. Kelly*, No. 06-CV-6616 (NGG) (LB), 2008 U.S. Dist. LEXIS 32954 (E.D.N.Y. Apr.

22, 2008), the plaintiff was arrested following a shooting in July 2003. *Id.* at *5. After a mistrial, he was acquitted in a second trial in December 2004. *Id.* In December 2006, plaintiff, acting *pro se*, filed his claims for false imprisonment, false arrest, excessive force, and coerced confession. *Id.* at *10. Citing *Wallace*, among other cases, the court ruled that the latest accrual date for his claims was July 2003, and thus, plaintiff's complaint was not timely filed. *Id.* at *9– 10. While recognizing the possibility of estoppel, waiver, or equitable tolling of the statute of limitations, the court dismissed plaintiff's claims because his briefing papers did not "suggest that any such relief is warranted in this case." *Id.* at *10. Thus, although the plaintiff's arrest and acquittal occurred before the Supreme Court issued its ruling in *Wallace*, his claims were still dismissed as time-barred.

A similar ruling was made in *McEachin v. City of New York*, No. 03-CV-6421 (CBA), 2007 U.S. Dist. LEXIS 23098 (E.D.N.Y. Mar. 29, 2007). There, the plaintiff was arrested in April 1999 and indicted by a grand jury in May 1999. *Id.* at *2. In August 2000, the plaintiff was acquitted of some of the charges, and he filed his § 1983 claim in December 2003. *Id.* at *3–4. On a motion to dismiss, the court ruled that "plaintiff's arrest on April 17, 1999 serves as the basis for the claim of false arrest." *Id.* at *9 (citing *Wallace*, 127 S.Ct. at 1100). Hence, the court ruled that "[a]pplying the three year time bar . . . would put the outside limit for commencement of plaintiff's § 1983 action at April 17, 2002 for the false arrest claim." *Id.* at

25

*10. The court proceeded to find that the plaintiff's allegations of insanity did not give rise to equitable tolling and dismissed his false arrest claim. *Id.* at *15.

In neither of the cases denying equitable tolling, however, was the court presented with a plaintiff who articulated grounds for equitable tolling. As set forth above, Plaintiffs here present compelling arguments that equitable tolling should apply, thus distinguishing the instant case from those in which tolling was denied. Accordingly, this Court finds that Plaintiffs' false arrest and false imprisonment claims are timely, and so Defendants' motion to dismiss them on the grounds that they are barred by the statute of limitations must be denied.[12]

## II.    Section 1983 and State-Law Claims for Malicious Prosecution

Defendants move for summary judgment on Plaintiffs' claims of malicious prosecution, while Plaintiffs cross-move for summary judgment striking the affirmative defense of qualified immunity and granting them summary judgment on these claims. A § 1983 claim for malicious prosecution requires the plaintiff to "demonstrate conduct by the defendant that is tortious under state law and that results in a constitutionally cognizable deprivation of liberty." *Kinzer v. Jackson*, 316 F.3d 139, 143 (2d Cir. 2003). A New York law malicious-prosecution claim requires the plaintiff to "show: (1) that the defendant commenced or continued a criminal

---

[12]  The other cases cited by Defendants from courts outside this district were decided on similar reasoning, and are distinguishable for the same reasons. (*See* Defs.' Mem. at 4–5.)

proceeding against him; (2) that the proceeding was terminated in the plaintiff's favor; (3) that there was no probable cause for the proceeding; and (4) that the proceeding was instituted with malice." *Id.* Because the Appellate Division overturned the Plaintiffs' convictions, the second prong of this test has been met. It appears at this time that the Defendants are moving for summary judgment based on the Plaintiffs' alleged failure to prove the first element of the malicious-prosecution claim, although the Defendants do not concede the other elements. (*See* Defs.' Mem. at 18 n.6.)

Defendants direct the court to *Wray v. City of New York*, 490 F.3d 189 (2d Cir. 2007), which dealt with the issue of a police officer being sued on a claim of malicious prosecution. The court ruled that "[i]n the absence of evidence that [the] [o]fficer . . . misled or pressured the prosecution or trial judge, we cannot conclude that his conduct caused the violation of Wray's constitutional rights; rather, the violation was caused by the ill-considered acts and decisions of the prosecutor and trial judge." *Id.* at 193.

On July 13, 1999, Culpepper testified in court at the Plaintiffs' criminal trial. In response to the judge's question "Lavar Hargroves is the one who had the orange jacket?" Culpepper answered "Yes. Right." (Pls.' Ex. 16 at 32–33.) He also testified that: "I just remember the orange jacket because it's, you know, you usually don't see—I don't usually see a bright color like orange jacket like that around." (*Id.* at 32.) Culpepper testified that he did not remember seeing any other color on the jacket. (*Id.* at 49.) He later told the court that "I saw like it was

27

orange" on the shoulder. (*Id.* at 93.) At another hearing, he told the judge that the defendants'
(here, Plaintiffs) dress "appeared to be the same" when they were arrested and when they were
photographed at the police station. (Pls.' Ex. 17a at 179.) In addition, on February 17, 2000,
defendant Liotta testified that "I do recall seeing a black and orange jacket" at the arrest scene
and that "one of them that was arrested was wearing a black and orange jacket." (Pls.' Ex. 18 at
226.)

As noted above, there is one photograph in the record that depicts a blue and red jacket,
with what appears to be a reflective, lighter red inner lining. (*See* Pls.' Ex. 40.) Notably the
appearance of the lining differs from that picture to another one in the record; a Polaroid taken
the night of the arrest (Pls.' Ex. 41), in which the lining appears almost beige. Also as noted
above, none of the other Plaintiffs was wearing an orange jacket.

This Court is not in the position to grant summary judgment on the malicious prosecution
claim to either of the parties. Given how two different photographs of Lavar Hargroves taken on
the night of his arrest show different shades of color on his jacket, it is not clear how the coat he
was wearing when he was arrested actually looks. The record so far in this case does not give
any definite answers on the reliability of the color processing in the arrest photographs. The key
issue is whether Culpepper and Liotta lied to the prosecutors or the judge about what colors were
on the Plaintiffs' jackets when they were arrested. Looking at the record as a whole, it is quite

28

clear that a genuine issue of material fact remains unresolved—namely what colors the jackets were.

What the suspect was wearing at the time of the crime is a textbook example of a genuine issue of material fact that must be resolved at trial. Since this court has found no clear answers in the record, summary judgment on the § 1983 malicious prosecution claim must be denied.

### III. Section 1983 Claims for Assault and Battery

Plaintiff David Allen has also filed § 1983 claims for assault and battery[13] arising entirely out of the conduct of police during his arrest, which occurred in March 1998. Because "[c]auses of action for assault and battery accrue immediately upon the occurrence of the tortious act", the limitations period on these claims began running on the night Allen was arrested. *Lettis v. United States Postal Serv.*, 39 F. Supp. 2d 181, 204 (E.D.N.Y. 1998). The statute of limitations for "§ 1983 actions arising in New York . . . is three years." *Eagleston v. Guido*, 41 F.3d 865, 871 (2d Cir. 1994). Hence, the limitation period for the assault and battery claims under § 1983 would have expired in March 2001, well before Allen filed his complaint in September 2003. Potential complications related to the *Wallace* accrual rule do not affect the analysis here, since courts in

---

[13] The Defendants' moving papers primarily refer to these claims as "excessive force," although Defendants have made it clear to the court that they have requested summary judgment over the assault and battery claims. (Defs.' Mem. at 6.)

this circuit have always held that assault and battery claims arising out of an arrest begin to accrue at the time of the arrest. *See, e.g., Espada v. Schneider*, 522 F. Supp. 2d 544, 550 (S.D.N.Y. 2007). Thus, the § 1983 claims for assault and battery are time-barred.

## IV.    Section 1985 Claims

Plaintiff David Allen brings claims for conspiracy to commit false arrest, malicious prosecution, and assault and battery under 42 U.S.C. § 1985. Inasmuch as Allen brings a § 1985 claim for false arrest, it is unclear whether that claim is time-barred.[14] Actions commenced under § 1985, like those under § 1983, have a three-year statute of limitations, *Blankman v. County of Nassau*, 819 F. Supp. 198, 206 (E.D.N.Y. 1993), *aff'd, 14 F.3d 592 (2d Cir. 1993); accord Daniel v. Safir*, 175 F. Supp. 2d 474, 479 (E.D.N.Y. 2001), and were, at least prior to *Wallace*, also governed by the principles of *Heck. See Amaker v. Weiner*, 179 F.3d 48, 51–52 (2d Cir. 1999). While § 1985 actions have not been expressly limited by the *Wallace* accrual rule, § 1983 and § 1985 are usually treated together. *See Annis v. County of Westchester*, 36 F.3d 251, 253 & n.2 (2d Cir. N.Y. 1994). This Court need not decide the issue, as Allen's § 1985 claim would be held timely either under pre-*Wallace* law or pursuant to equitable tolling as discussed above.

---

[14]  While plaintiff Allen failed to indicate in his complaint the subsection of § 1985 under which he is claiming relief, the Court will assume it to be 42 U.S.C. § 1985(3), as the other sections would not apply to his claims of false arrest, malicious prosecution, or assault and battery.

Defendants argue that, even if Allen's claims are timely, the intracorporate conspiracy doctrine prevents Allen's conspiracy claims from going forward to trial. Under this doctrine, "the officers, agents, and employees of a single corporate entity, each acting within the scope of her employment, are legally incapable of conspiring together." *Little v. City of New York*, 487 F. Supp. 2d 426, 441–42 (S.D.N.Y. 2007) (internal quotations and citation omitted). However, "[a]n exception to the intracorporate conspiracy doctrine exists where the individuals are motivated by an independent personal stake in achieving the corporation's objective." *Id.* at 442 (internal quotations and citation omitted). Nevertheless, this "personal stake must be separate and apart from the bias itself, or else the exception would swallow the rule." *Jeter v. N.Y. City Dep't of Educ.*, 549 F. Supp. 2d 295, 303 (E.D.N.Y. 2008) (internal ellipses, quotations and citation omitted).

Here, Plaintiff Allen has presented no evidence to suggest that any of the officer Defendants had a personal stake in falsely arresting him. Hence, there is no genuine issue of material fact as to his § 1985 claims. Summary judgment on these claims must be granted to the Defendants.

## V.     Claims Against Detective John Warner

Plaintiff Allen named Detective John Warner as a defendant for each of the claims in his complaint. Defendants have asked for all claims against Warner to be dismissed due to his lack of personal involvement. Plaintiffs and Defendants agree that Warner "testified that his only role

31

was taking the exculpatory statements of Brandon Hargroves and Tyree Hargroves, and possibly taking photographs of one or more Hargroves plaintiffs at the precinct station house." (Pls.' L.R. 56.1 Resp. Stmt. ¶ 64.) In their Rule 56.1 statements before this Court, Plaintiffs have not alluded to any other involvement that Warner might have had with them, and they have not addressed Warner in their opposition papers.

According to the Second Circuit, "[a] defendant may be personally involved in a constitutional deprivation within the meaning of 42 U.S.C. § 1983 in several ways." *Williams v. Smith*, 781 F.2d 319, 323 (2d Cir. 1986). One way involves "directly participat[ing] in the infraction." *Id.* In addition, "[a] supervisory official, after learning of the violation through a report or appeal, may have failed to remedy the wrong", "[a] supervisory official may be liable because he or she created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue", and "a supervisory official may be personally liable if he or she was grossly negligent in managing subordinates who caused the unlawful condition or event." *Id.* at 323–24.

Plaintiff has not put forth any evidence that fits into any of these categories. There are no allegations that the exculpatory statements or photographs were the cause of any of the alleged constitutional deprivations. Rather, the case focuses on the arrest and prosecution of the Plaintiffs. Thus, Plaintiffs have failed to show any issue of material fact regarding the claims against Warner, and they must be dismissed.

## VI. Claims Against the City of New York

Defendants have moved for summary judgment with regard to Plaintiffs' claims against the City, arguing, first, that the Plaintiffs' failure to establish that any individual Defendant or city employee committed a constitutional tort means that there can be no § 1983 liability against the City, and second, that the Plaintiffs have failed to file proper notices of claim with respect to their state law claims. The court will address these arguments in turn.

### A. Alleged Lack of Injury

"[M]unicipalities may be sued directly under § 1983 for constitutional deprivations inflicted upon private individuals pursuant to a governmental custom, policy, ordinance, regulation, or decision." *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)). According to the Supreme Court, "[i]f a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point." *Los Angeles v. Heller*, 475 U.S. 796, 799 (U.S. 1986). In other words, "[i]f there is no underlying constitutional violation by a municipal official, the municipality is not liable." *Khan v. Ryan*, 145 F. Supp. 2d 280, 285 (E.D.N.Y. 2001).

This court has not dismissed all of the § 1983 claims against the police officer Defendants. The claims for false arrest and malicious prosecution have survived this motion for summary judgment and will go forward to trial. Hence, the court cannot grant summary judgment to the City on this basis.

*B.      Notices of Claim Pursuant to New York General Municipal Law § 50-e*

Defendants' also attempt to shield the City from liability by arguing that the Hargroves

Plaintiffs' claims against the City must be dismissed for failure to comply with the requirements

of New York General Municipal Law § 50-e.[15]  While Defendants concede that the notices were

timely served, they argue that the notices fail to comply with the requirements of § 50-e because

they provide the City with insufficient detail regarding Plaintiffs' claims that the City failed to

properly hire, train, and supervise its employees.  New York state law requires that "a notice of

claim shall have been made and served upon the city" in order for actions of "personal injury,

wrongful death or damage to real or personal property" to be maintained against the city for the

actions of its employees, agents or officers.  N.Y. Gen. Mun. Law § 50-i(1).  The notice must set

forth "the nature of the claim."  N.Y. Gen. Mun. Law § 50-e(1)(2)(2).

In determining the sufficiency of a notice of claim, the relevant inquiry is "whether it

includes information sufficient to enable the [municipality] to investigate the claim . . . ."

*O'Brien v. City of New York*, 54 N.Y.2d 353, 357 (1981).  Specifically, the notice should include

a description sufficient to allow the municipality to "locate the place, fix the time[,] and

---

[15]  Defendants inform this Court that Judge Sifton dismissed Plaintiff Allen's claims against the City because his notice of claim was untimely.  (Defs.' Mem. at 24 n.7; *see also* Minute Entry, *Allen v. City of New York*, No. 03-cv-4646 (Doc. No. 24).)  Plaintiffs appear to concede this ruling.  (Pls.' Mem. (Doc. No. 112) at 64.)

understand the nature of the [claim]." *Brown v. City of New York*, 95 N.Y.2d 389, 393 (2000). "The circumstances of each case will determine whether the notice complies with the content requirement of section 50-e." *Ferlito v. County of Suffolk*, Civ. A. No. 06-5708 (DRH)(AKT), 2007 U.S. Dist. LEXIS 85523, at *9 (E.D.N.Y. Nov. 19, 2007) (citing *Levine v. City of New York*, 111 A.D.2d 785, 786 (N.Y. App. Div. 1985)).

In their memorandum in support of the motion for summary judgment, the Defendants claim that "the Notices of Claim do not set forth any facts whatsoever concerning a claim against the City of New York regarding the City's failure to properly hire, train, and supervise their employees." (Defs.' Mem. at 24.) Plaintiffs state that their "notices each set forth the date, location and nature of the claim." (Pls.' Mem. (Doc. No. 112) at 63.) As an initial matter, while Defendants claim that the notices fail to notify the City that the Plaintiffs intend to proceed against the City on a *respondeat superior* theory of liability, (Defs. Mem. At 24), this argument must be rejected. Simply filing the notices of claim evinces such an intent, and the Defendants have offered no case that held differently.

Furthermore, with respect to Plaintiffs' claims of failure to properly hire, train, and supervise, Defendants have not set forth any case law to support their contentions that the Hargroves Plaintiffs' notices of claim were insufficient to put the City on notice of these claims. The three cases they cite deal with notices that were not timely served, not notices that were too vague or that failed to specify a theory of liability pursued in the complaint. *See Jones v. Stancik*,

35

No. 02-CV-4541 (SJ), 2004 U.S. Dist. LEXIS 28196, at *15–16 (E.D.N.Y. Mar. 7, 2004); *Mejia v. City of New York*, 119 F. Supp. 2d 232, 255–56 (E.D.N.Y. 2000); *Davidson v. Bronx Mun. Hosp.*, 484 N.Y.S.2d 533, 534–35 (N.Y. 1984). While this Court has uncovered at least a few cases dismissing claims for, *inter alia*, negligent hiring, training, or retaining practices for failure to specify factual allegations with respect to such a cause of action, see *Ferlito*, 2007 U.S. Dist. LEXIS 85523, at *10–11; *Phoenix Sound, Inc. v. City of New York*, 19 A.D.3d 328, 239 (N.Y. App. Div. 2005), neither the record nor the law is clear enough to justify dismissal at this time.

Finally, and as pointed out by Plaintiffs, (Pls.' Mem. at 64), given that Plaintiffs' federal law claims of false arrest and malicious prosecution survive this motion, and that the City may be subject to liability under *Monell*, denying the City summary judgment on Plaintiffs' state law claims will not affect the scope of discovery or the evidence that Plaintiffs must present at trial to prove liability against the City. For all of the above reasons, there remain genuine issues of material fact in dispute that preclude summary judgment in favor of the City.

## CONCLUSION

For the foregoing reasons, it is ORDERED that Defendants' motion for summary judgment is GRANTED in part as to Plaintiff Allen's § 1983 claims for assault and battery and his § 1985 claims and the claims against Defendant Warner, and DENIED as to all of Plaintiffs' remaining claims. Plaintiffs' motion for summary judgment is DENIED in its entirety.

This case is re-committed to Magistrate Judge Andrew L. Carter for resolution of any remaining discovery issues, and all other pre-trial purposes.

SO ORDERED.

Dated: Brooklyn, New York
      March 4, 2010

_____
ROSLYNN R. MAUSKOPF
United States District Judge